**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| FRANKIE ENRIQUEZ,<br><br>                  Petitioner,<br><br>vs.<br><br>WARDEN HARTLEY,<br><br>                  Respondent. | Civil No.      1:08-0335-BTM (BLM)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

**I.    INTRODUCTION AND PROCEDURAL BACKGROUND**

      Frankie Enriquez (hereinafter "Enriquez"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus in the Eastern District of California (Fresno Division) on March 10, 2008 [doc. no. 1]. On November 25, 2008, the Petition was reassigned to visiting District Judge Barry Ted Moskowitz for all further proceedings [doc. no. 14] and, on December 18, 2008, the Petition was assigned to visiting Magistrate Judge Barbara L. Major for all non-dispositive motions and matters and for such dispositive motions and matters as assigned [doc no. 15].

      Enriquez is serving a prison sentence of 17 years to life after being convicted by jury of second degree murder with use of a firearm. (Petition (hereafter, "Pet.") at ¶¶ 1-5; Respondent's Answer (hereafter, "Answer") [doc. no. 9] at p. 1.) Enriquez's Petition, brought pursuant to 28


U.S.C. § 2254, does not challenge the legality of his conviction or sentence, but instead alleges that he was denied due process when the Board of Parole Hearings (hereafter, "Board") denied him a parole date after an April 11, 2006 hearing. (Pet. at ¶ 12 and attached pages.) Enriquez contends his due process rights were violated when: (1) the Board's finding that he posed an unreasonable risk of danger to society if paroled was based on no evidence; (2) each ground relied upon by the Board to deny him a parole date was based on no evidence; (3) the Board's denial of parole improperly ignored the mandate under California law that the Board set a parole date; (4) the Board has failed to establish standard criteria for determining the number of years to deny parole in violation of Enriquez's rights to due process and equal protection; (5) the Board illegally denied him a parole date for two years; and (6) the Board failed to consider the determinate term as a factor in evaluating his suitability for parole. (*Id*.)

Enriquez filed a petition for writ of habeas corpus in Kern County Superior Court, which that court denied on March 5, 2007 in a reasoned order. (Answer, Exs. A & B.) He then filed a habeas petition in the California Court of Appeal, which was denied without prejudice on March 22, 2007. (Answer, Exs. C & D.) Enriquez then filed a petition for writ of habeas corpus in the California Supreme Court. (Answer, Ex. E.) The California Supreme Court denied the petition without reasoned decision or citation to authority on February 27, 2008. (Answer, Ex. F.)

Enriquez filed the Petition in this case on March 10, 2008. Respondent filed an Answer on June 11, 2008. Enriquez filed a Traverse on July 14, 2008 [doc. no. 11]. The Court has now considered the Petition, Answer, Traverse, and all the supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court **DENIES** the Petition.

## II.     THE 2004 SUBSEQUENT PAROLE CONSIDERATION HEARING

On April 11, 2006, Enriquez appeared before a panel of two Board commissioners, Presiding Commissioner Sandra Bryson and Deputy Commissioner Dylan Sullivan, for a Subsequent Parole Consideration Hearing (hereafter "the hearing"). (Pet., Exh. 1, Hearing Transcript (hereafter "HT") at 1-2). Enriquez was represented by counsel Candace Christensen. (HT at 2.) Presiding Commissioner Bryson began the hearing by asking Enriquez to explain what

happened and describe his role in the 1987 crime. (HT at 7.) Enriquez stated that he had "been having problems with peeping tom[s]." (HT at 8.) He explained that multiple persons had, over time, looked at him through his homes' windows and had on several occasions broken into the house while he was asleep. (HT at 8-9.)

> [¶] . . . Well, I'd been having problems with him even before that. I mean, at one time – I was in the bathroom one time and I seen some chipped paint on the floor and I looked up and I seen an eyeball looking at me through the vent, little vents upstairs, you know, in the – in the attic. So I went outside, by that time they'd already gone. He was gone. But most of the time there was three of them. Three guys most of the time.

(HT at 7.) With regard to the facts of the crime, Enriquez stated:

> [¶] So one day I went bowling, come back from bowling and I caught one of them on the side of the house so I went inside the house and got my gun and ran after them, they took off running. But I didn't know – it was at nighttime. I didn't know they were youngsters, you know. I couldn't tell that he was a youngster. So I told him to stop running and he stopped and I went to bring him back to the house. I hit him with the gun and it went off and that's what happened that night.

(HT at 6-7.)

When questioned by the Board members, Enriquez admitted that he had "five or six margaritas" over a period of three hours prior to the crime, in addition to doing "a little bit of coke." (HT at 8-10.) Enriquez was 39 years old at the time of the crime, had firearms training from time spent in the Army, and the .22 caliber revolver he retrieved from his house was an unlicensed gun that he had "just borrowed . . . the night before." (HT at 11, 14-15.) He told the commissioners that he borrowed the gun in order to go target shooting the following day. (HT at 21.)

While Enriquez stated, in response to questioning from the commissioners, that his goal was to return the victim to the house in order to call the police, he grabbed the victim and hit him with the gun even though the victim was unarmed and had stopped running. The gun went off, shooting the victim, and Enriquez "[j]ust took off back to the house." (HT 15-18.) Enriquez insisted that he chased the victim with the gun only in order to scare him and that he did not even realize that the gun was cocked. (HT at 23-24.) Enriquez then disposed of the gun, did not report the "accident," and evaded capture by the police for almost a year. (HT at 18-20.) Enriquez stated

"I don't think my mind was right at the time. You know." (HT at 21.)  After shooting the victim, Enriquez left him in the street without knowing whether he was alive or dead. (HT at 25-26.)

After the Board reviewed Enriquez's personal and institutional histories (HT at 26-45), Enriquez's attorney emphasized that Enriquez's psychological evaluations had been positive and reported him as a "low degree of threat to society." (HT at 46.)  After further questioning by the commissioners about his post-parole plans and letters of recommendation (HT at 46-56), attorney Christensen asked several clarifying questions of Enriquez and made a closing statement emphasizing Enriquez's lack of criminal history prior to the crime, his excellent institutional history, his vocational achievements, his 12-step work with regard to his former drug and alcohol abuse, and concluded that Enriquez was "an excellent candidate for parole." (HT 56-61.)

The Board took a recess and then Presiding Commissioner Bryson rendered its decision:

> [¶] All right, sir, the Panel reviewed all information received from the public and relied on the following circumstances in concluding that you are not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public if released from prison. . . . Sir, you have no priors. Although you do have prior criminality in admitting that you were excessively drinking and using cocaine and you admit to using periodically. At one point in our reportage, we have you using it once a week and as frequently as that although you other times said you used it once a month. And then you also admitted to a misdemeanor DUI prior. As to your institutional behavior, you've programmed commendably. Prior to your incarceration you received your high school diploma and you did college work at Bakersfield City College but when incarcerated you have a TABE score, TABE score of 12.9 which is the highest achievable. You have achieved two vocations, one in auto body and paint and the other in automotive. You have received several laudatory chrono's. The most outstanding one, the most recent in 2006. You have, apparently, always worked while incarcerated. You have taken place on – or take part on a regular basis in AA and in NA and other courses such as Breaking Barriers and anger management. You have a – a laudatory record in prison. From the disciplinary standpoint you have no 115's and three minor 128(a)'s. So you've displayed positive behavior in prison and everyone has noted that. As to your psychological report dated May 26, 2004, by Dr. Wallace he assesses you with a fairly high Global Assessment of Functioning of 88 and a low risk of future violence. Excuse me. As to your parole plans, you appear to have viable residential plans in your last legal residential county in California and that is with your mother. And you – you appear to have acceptable employment plans and that is to return to Jimmy's Body Shop where you had been working prior to the instant crime. As to Penal Code 3042 responses, responses indicating opposition to a finding of parole suitability, we received from the District Attorney's Office of Kern County. In a separate decision the Hearing Panel finds it is not reasonable to expect that parole would be granted at a hearing during the following two years. Specific reasons for this finding are as follows. The offense was carried out in an especially cruel and callous manner in that the victim, Russell Allen Clark, Jr., 17-year-old male, was unarmed walking away then running away and presenting no threat to you. The offense was carried out in a dispassionate and calculated manner

in that you retrieved a gun from the place where you were living, you chased after him with a loaded .22 caliber revolver, the hammer cocked and at some point shouted quote "stop, I've got a gun". End quotes.  The offense was carried out in a manner demonstrating exceptionally callous disregard for human suffering in that you caught Clark, spun him around, keeping him pointed away from you, marched him down the alley with the gun to his head and attempted to strike him with the gun barrel but shot him in the head.  Clearly, public safety was at risk and you also had opportunities to cease but you continued with the crime.  Moreover, the motive for the crime was very trivial in relation to the offense.  The claim was that you thought he was a prowler and that you [were] trying to apprehend him for the police which contradicts, sir, the facts that in the aftermath of this crime you hid the evidence of your crime in – by throwing away the pistol and you also evaded police capture for almost a year.  Sir, in describing your crime you've made statements that defy credibility and that conflict with the facts of the crime leads this Panel to believe you continue to be unpredictable and a threat to others.  And, sir, I note that the immediately prior Board, or excuse me, Panel of the Board gave you a one-year denial and we're giving you two years not as a punitive measure but you were given one year before and you came back to the Board – prior Panel must've felt you were close.  But, basically, you came back to this – this Board and today you're – you're describing this crime in a fashion that does not show you taking a responsibility for the facts of this crime based on your training, in particular.  And so we're going to deny you for two years. . . .

(HT at 62-67.)  Deputy Commissioner Sullivan added:

[¶] Yes.  Sir, trying to think of – of a concise way to tell you that when – when you say things like I wasn't sure that the gun was cocked and you have training in using firearms it's just not credible.  It's not believable.  And the problem is that we need to know that you are in a reasonable state of mind before we parole you.  And so in – today – who you are today, you've done well in the institution so who you are today you have to be able to reflect on what happened then in a reasonable way or else we have no assurances that you're going to be – remain – have good conduct when you get out – . . . – out into the world.  And the, you know, the fact that you went in the house and got the gun, that you took the gun out, that you cocked the gun, that you grabbed this kid, you had to realize it was a kid once you grabbed him, that you left him there, you didn't check to see whether or not he was dead or alive, you didn't turn yourself in for a year.  Those are just the facts.  So you need to come in here and discuss them and in a more – you – you just didn't appear credible today and I don't know that I believe that you're not a credible person.  So I am telling you that to be really honest with you about what my appearance of you was so that you will have an opportunity to think about that over the next couple years and do a better job of presenting yourself next time in front of th Board.

(HT at 67-68.)

### III. DISCUSSION

#### A. Scope of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

[¶] The Supreme Court, a Justice thereof, a circuit judge, or a district court shall

> entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C. § 2254(a) (West 2008) (emphasis added). As amended, 28 U.S.C. § 2254(d) reads:

> [¶] (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> > [¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > [¶] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (West 2008) (emphasis added).

"[The Antiterrorism and Effective Death Penalty Act ("AEDPA")] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Womack v. Del Papa*, 497 F. 3d 998, 1001 (9th Cir. 2007), quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002). To obtain federal habeas relief, Enriquez must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003). The "objectively unreasonable" standard is not met by a showing of error or of an incorrect application (as opposed to an objectively unreasonable application) of the governing federal law. *Andrade,* 538 U.S. at 75; *Woodford,* 537 U.S. at 25; *Bell v. Cone*, 535 U.S. 685, 694, 699 (2002) ("it is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied [the Supreme Court precedent] incorrectly"). As the Supreme Court explained, this standard is different from the "clear error" standard in that "[t]he gloss of clear error fails to

give proper deference to state court by conflating error (even clear error) without unreasonableness." *Andrade,* 538 U.S. at 75.

Where there is no reasoned decision from the state's highest court, this Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

**B.    Analysis**

Enriquez claims that his due process rights were violated when: (1) the Board's finding that he posed an unreasonable risk of danger to society if paroled was based on no evidence; (2) each ground relied upon by the Board to deny him a parole date was based on no evidence; (3) the Board's denial of parole improperly ignored the mandate under California law that the Board set a parole date; (4) the Board has failed to establish standard criteria for determining the number of years to deny parole in violation of Enriquez's rights to due process and equal protection; (5) the Board illegally denied him a parole date for two years; and (6) the Board failed to consider the determinate term as a factor in evaluating his suitability for parole. (Pet. at ¶ 12 and attached pages.)

In Enriquez's case, the California Supreme Court, as well as the appellate court, denied his habeas petitions without furnishing a basis for its decision. (Answer, Exs. D & F.) Accordingly, this Court "looks through" to the reasoning provided by the Kern County Superior Court in denying Enriquez's habeas petition filed there. That court stated:

> [¶] Petitioner protests the finding of his unsuitability for parole. Petitioner contends that the Board of Hearings and Parole found him unsuitable for parole without any reason, and that there is no evidence the Board can rely on to keep him incarcerated. Petitioner contends that his continued incarceration violates his liberty interest under the Fifth and Fourteenth Amendments of the U.S. Constitution.
>
> [¶] Petitioner contends that he has led an exemplary life in prison free of discipline, drugs and alcohol. Petitioner also contends that he has a job upon release by working in the family automotive business. Petitioner contends that he feels bad about the crime and the devastation it caused the victim's family.

[¶] The court notes that the hearing decision cites two important reasons for denying parole to petitioner. First, the crime was especially callous in that the victim, Russell Clark, was pursued by petitioner, marched in the alley, and shot in the head. Second, the petitioner's version of events lack[s] credibility. His current state of mind is rationalizing why he committed the crime, rather than coming to grips with why he did what he did. Petitioner's rationalization for committing the crime as he currently states is that he and his live-in girlfriend had prowlers.

[¶] Petitioner contends that he did not know the gun was cocked, and he intended to hit the victim in the shoulder. However, petitioner's version of events contradicts the police report.

[¶] The Department of Corrections can view the callousness of the crime as grounds for finding petitioner unsuitable for parole. 15 Cal. Code Regs. Section 2281(c)(1)(d). However, the Board does not limit its decision just to the crime which occurred [in] 1988. The Board found petitioner's version of events and [h]is current state of mind as lacking credibility. Rather than taking responsibility for his actions, petitioner rationalizes his actions even today (see hearing transcript pp 5-6.[)] Where there is some evidence to deny petitioner's suitability for parole, the courts will uphold the Board's decision. In re Powell, (1988) 45 Cal. 3d 894, 902, 904; In re: Rosenkrantz, (2002) 29 Cal. 4th 616, 658. Further, the Board is free to evaluate whether the petitioner poses a threat to public safety. In re: Dannenberg (2005), 34 Ca. 4th 1061, 1079-1080. Here, the Board found that the callousness of the crime, plus the lack of credibility of petitioner signified that petitioner was unpredictable. This unpredictability is a danger to the public.

[¶] Notwithstanding petitioner's exemplary behavior within prison, petitioner could come to accept responsibility for his crime rather than rationalize its commission.

[¶] On the basis of the foregoing, the petition for writ of habeas corpus is denied.

(Answer, Ex. B at 3-4.)

In California, parole suitability hearings address the issue of whether prisoners should be released on parole after serving their minimum terms. Pursuant to California Penal Code (hereafter "Penal Code") section 3041, ". . . prior to [an] inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date . . . ." Prisoners serving indeterminate life sentences that include the possibility of parole are not entitled to release on parole, but they are entitled to be considered for parole. *In re Dannenberg*, 34 Cal.4th 1061, 1078, 1080 (2005). The parole consideration criteria applicable to life prisoners convicted of murder (convicted on or after November 8, 1978) are as follows:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. <u>Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.</u>

(b) Information Considered.  <u>All relevant, reliable information available to the panel shall be considered in determining suitability for parole</u>. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(CAL CODE OF REGS. tit. 15, § 2402 (a) & (b) (2008) (emphasis added))[1].

Only errors of federal law can support federal intervention in state court proceedings, and only to correct such errors. *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989) (stating that federal courts are not concerned with errors of state law unless they rise to the level of a constitutional violation). Additionally, federal habeas courts are bound by the state's interpretation of its own laws. *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal courts may not reexamine state court determinations on state law issues).  It is well established that there is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7 (1979).  Nevertheless, a state can create "a liberty interest protected by the due process guarantees" when its parole scheme employs "statutory language [that] itself creates a protectible expectation of parole." *Greenholtz*, 442 U.S. at 11-12; *see Board of Pardons v. Allen*, 482 U.S. 369, 376 (1987); *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 463 (1989).  The Ninth Circuit has repeatedly held that the mandatory language of § 3041(a) vests inmates with a cognizable liberty interest in a parole date. *See, e.g.*, *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (holding that a California state prisoner serving a life sentence has a cognizable liberty interest in release on parole, based on California's parole scheme closely resembling those interpreted in *Greenholtz* and *Allen*).

---

[1] Unchanged from the 2006 version.

1  //

2

3      It is clearly established Supreme Court law that:

4      [T]he requirements of due process are satisfied if some evidence supports the
       decision by the prison disciplinary board . . . . This standard is met if "there was
5      some evidence from which the conclusion of the administrative tribunal could be
       deduced. . . ." *United States ex rel Vajtauer v. Commissioner of Immigration*, 273
6      U.S. [103] at 106 [1927]. Ascertaining whether this standard is satisfied does not
       require examination of the entire record, independent assessment of the credibility
7      of witnesses, or weighing of the evidence. Instead, <u>the relevant question is whether
       there is any evidence in the record that could support the conclusion reached by the
8      disciplinary board</u>.

9  *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985) (emphasis added); *Irons v. Carey*, 505 F.3d

10 846, 851 (9th Cir. 2007) (applying decision in *Hill* to parole board decisions). A federal habeas

11 court's analysis to determine whether a parole denial was supported by "some evidence" is

12 "framed by the statutes and regulations governing parole suitability determinations in the relevant

13 state." *Irons*, 505 F.3d at 851 ("the Supreme Court [has] clearly established that a parole board's

14 decision deprives a prisoner of due process with respect to this interest if the board's decision is

15 not supported by 'some evidence in the record' . . . or is 'otherwise arbitrary'"), *quoting Sass*, 461

16 F.3d at 1128-29, *citing Hill*, 472 U.S. at 457. In reliance on that authority, the *Irons* court

17 concluded: "Accordingly, here we must look to California law to determine the findings that are

18 necessary to deem a prisoner unsuitable for parole, and then must review the record in order to

19 determine whether the state court decision holding that these findings were supported by 'some

20 evidence' in [the petitioner's] case constituted an unreasonable application of the 'some evidence'

21 principle articulated in *Hill* . . . ." *Irons*, 505 F.3d at 851.

22      Enriquez contends, essentially, in Claims 1 through 3 that the Board's decision denying

23 him a parole date was incorrect under governing state law. However, the Board's refusal to grant

24 Enriquez a parole date was supported by some evidence, and some evidence is all that is required.

25 As set forth in Section II above, the Board found that Enriquez posed an unreasonable risk of

26 danger to society if released from prison. (*See* HT at 62-68.) The Board based its decision on

27 several factors, but chiefly the nature of the commitment offense and the fact that Enriquez had not

28 accepted responsibility for the killing and persisted in rationalizing the event in an incredible way.

(*Id.*)  Thus, some evidence supports the Board's decision to deny parole.

//

Specifically with respect to Claims 1 and 2 (which both contend that the decision to deny parole was based on no evidence), the Kern County Superior Court did not err in denying Enriquez's petition for writ of habeas corpus, for the reasons set forth herein.  The parole denial, and its inherent finding that Enriquez remained unsuitable for parole and dangerous to public safety, did meet the "some evidence" standard, as discussed above.  With respect to Claim 3, the Board did not ignore the fact that state prisoners serving indeterminate life sentences have a protected liberty interest in parole.  Enriquez's case was considered using the appropriate state law standards, and the Board denied him parole based not only on the nature of the commitment offense, but on other grounds, such as Enriquez's ongoing refusal to take responsibility for the killing.  Accordingly, the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.

 In Claim 4, Enriquez asserts that the Board has failed to establish criteria for determining the number of years for an inmate to be denied parole, violating his rights to due process and equal protection.  However, Enriquez has provided this Court with no evidence and no authority (and the Court is aware of none) that supports this position.  While Enriquez presented this claim to the California Supreme Court, there is no reasoned state court decision denying the claim.  Accordingly, this Court conducts an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d at 982; *accord Himes v. Thompson*, 336 F.3d at 853.

With respect to the due process portion of Enriquez's claim, clearly established Supreme Court law requires only that "some evidence supports the decision by the prison disciplinary board," the relevant question being "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board."  *Hill*, 472 U.S. at 455-56; *Irons*, 505 F.3d at 851.  As detailed herein, and as supported by the Board's findings, Enriquez received all the

process that was due him under federal law.  There is no federal due process requirement mandating states to establish criteria to determine the number of years before an inmate is entitled to a subsequent parole hearing.

With respect to the equal protection portion of Enriquez's claim, in order to prevail, he must show that he was similarly situated to other inmates who received preferential treatment. *See Fraley v. Bureau of Prisons*, 1 F.3d 924, 926 (9th Cir. 1993); *see also McQueary v. Blodgett*, 924 F.2d 829, 834-35 & n.6 (9th Cir. 1991). "General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle." *McQueary*, 924 F.2d at 934. Enriquez bears the burden of establishing uneven application. *Id.* at 835.  This Court finds that Enriquez has failed to assert that he was somehow treated differently than other similarly situated inmates.  Thus, the equal protection portion of Enriquez's claim fails, and the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.  Accordingly, Claim 4 is denied.

In Claim 5, Enriquez asserts that the Board illegally denied him a parole date for two years.  While Enriquez presented this claim to the California Supreme Court, there is no reasoned state court decision denying the claim.  Accordingly, this Court conducts an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d at 982; *accord Himes v. Thompson*, 336 F.3d at 853.  This claim alleges that the Board improperly applied California law to its decision that Enriquez be denied parole for two (rather than one) years. Federal habeas courts are bound by the state's interpretation of its own laws and, thus, this Court may not reexamine the state court's determination that Enriquez's parole denial complied with state law principles and sentencing guidelines.  *Himes*, 336 F.3d at 852; *Estelle v. McGuire*, 502 U.S. at 68.

In any event, the Board properly applied controlling state law to Enriquez's case.  At the time of the hearing, Penal Code section 3041.5(b)(2) stated in part: ". . . The board shall hear each case annually [after the initial denial of parole], except the board may schedule the next hearing no

1  later than the following: [] Two years after any hearing at which parole is denied if the board finds
2  that it is not reasonable to expect that parole would be granted at a hearing during the following
3  year and states the bases for the finding." (*Id.*, West 2004.) The Board denied Enriquez a parole
4  date for two years, stating:

> Sir, in describing your crime you've made statements that defy credibility and that conflict with the facts of the crime leads this Panel to believe you continue to be unpredictable and a threat to others. And, sir, I note that the immediately prior Board, or excuse me, Panel of the Board gave you a one-year denial and we're giving you two years not as a punitive measure but you were given one year before and you came back to the Board – prior Panel must've felt you were close. But, basically, you came back to this – this Board and today you're – you're describing this crime in a fashion that does not show you taking a responsibility for the facts of this crime based on your training, in particular. And so we're going to deny you for two years. . . .

11 (HT at 66.) Because the Board specified its reason for giving Enriquez a two-year denial, it
12 complied with applicable state law in rendering its decision. Thus, the state court's denial of this
13 claim was neither contrary to, nor an unreasonable application of, clearly established Supreme
14 Court law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13. Accordingly, Claim 5 is
15 denied.

16    In Claim 6, Enriquez contends that the Board failed to consider his determinate sentencing
17 term as a factor in evaluating his suitability for parole. While Enriquez presented this claim to the
18 California Supreme Court, there is no reasoned state court decision denying the claim.
19 Accordingly, this Court conducts an independent review of the record to determine whether the
20 state court's decision is contrary to, or an unreasonable application of, clearly established Supreme
21 Court law. *See Delgado v. Lewis*, 223 F.3d at 982; *accord Himes v. Thompson*, 336 F.3d at 853.
22 This claim alleges that the Board improperly applied California law to its decision regarding
23 Enriquez's suitability for parole. As stated previously, federal habeas courts are bound by the
24 state's interpretation of its own laws and, thus, this Court may not reexamine the state court's
25 determination that Enriquez's parole denial complied with state law principles and sentencing
26 guidelines. *Himes*, 336 F.3d at 852; *Estelle v. McGuire*, 502 U.S. at 68.

27    In any event, the Board properly applied controlling state law to Enriquez's case. ". . .
28 Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied

parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (CAL CODE OF REGS. tit. 15, § 2402 (a) (2008).) Because Enriquez is serving a 17 years to life sentence, and because the Board found that he would pose an unreasonable risk of danger to society if released from prison, the Board properly denied Enriquez a parole date. Prisoners serving indeterminate life sentences that include the possibility of parole are not entitled to release on parole, but they are entitled to be considered for parole. *In re Dannenberg*, 34 Cal.4th 1061, 1078, 1080 (2005). Thus, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13. Accordingly, Claim 6 is denied.

## V.  **CONCLUSION**

For all the foregoing reasons, the Petition is **DENIED**.

**IT IS SO ORDERED.**

DATED: October 2, 2009

_____
Honorable Barry Ted Moskowitz
United States District Judge